UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

MELISSA J.,[1]

       Plaintiff,

  v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

       Defendant.

Case No. 3:21-CV-00096-YY

OPINION AND ORDER

YOU, Magistrate Judge.

    Plaintiff Melissa J. seeks judicial review of the final decision by the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This court has authority to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, that decision is AFFIRMED.

    Plaintiff protectively filed for DIB on February 20, 2019, alleging disability beginning on November 13, 2014. Plaintiff's application was initially denied on March 26, 2019, and upon reconsideration on November 21, 2019. Plaintiff requested a hearing before an Administrative

---

[1] In the interest of privacy, the court uses only plaintiff's first name and the first initial of plaintiff's last name.

1 – OPINION AND ORDER

Law Judge ("ALJ"), which took place on July 24, 2020. At that hearing, plaintiff and a vocational expert testified. The ALJ issued a decision on August 20, 2020, finding plaintiff not disabled within the meaning of the Act. Tr. 15. The Appeals Council denied plaintiff's request for review on November 19, 2020. Tr. 1-3. Therefore, the ALJ's decision is the Commissioner's final decision and subject to review by this court. 20 C.F.R. § 416.1481.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009-10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). This court may not substitute its judgment for that of the Commissioner when the evidence can reasonably support either affirming or reversing the decision. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Instead, where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted); *see also Lingenfelter*, 504 F.3d at 1035.

## SEQUENTIAL ANALYSIS AND ALJ FINDINGS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to

determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 416.920; *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006) (discussing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)). The claimant bears the burden of proof at steps one through four. *Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001). The Commissioner bears the burden of proof at step five. *Id.* at 953-54.

At step one, the ALJ found plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 13, 2014, through her date last insured of December 31, 2019. Tr. 17. At step two, the ALJ determined plaintiff had the following severe impairments: lumbar spine degenerative disc disease, status post fusion and microdiscectomy; cervical spine degenerative disc disease; thoracic spine curvature; varicose veins; and left patellofemoral chondromalacia with a Baker's cyst (20 CFR 404.1520(c)). Tr. 17.

At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 16.

The ALJ next assessed plaintiff's residual functional capacity ("RFC") and found she was able "to perform light work as defined in 20 CFR 404.1567(b) except that she can never crawl or climb ladders, ropes, or scaffolds. She can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. She can tolerate occasional exposure to extreme cold and vibration. She can tolerate no exposure to hazards such as unprotected heights and moving machinery." Tr. 19.

At step four, the ALJ found plaintiff was capable of performing past relevant work as a dental assistant, which did not require work-related activities precluded by her RFC. Tr. 24. The ALJ also found that, with the added restriction of not being able to sit for no longer than two-hours in a day, plaintiff could perform other jobs, including housekeeping cleaner, agricultural

sorter, and general cashier. Tr. 25-26. Thus, the ALJ concluded plaintiff was not disabled. Tr. 26.

## DISCUSSION

I.  **Deep Venous Thrombosis and Recurrent Blood Clots**

Plaintiff contends the ALJ erred by failing to properly consider whether her deep venous thrombosis ("DVT") and recurrent blood clots were severe impairments.

A.  **Relevant Law Regarding Step Two Analysis**

Step two is a de minimis screening device to dispose of groundless claims. *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005). At step two, the ALJ determines if the claimant has a medically "severe" impairment or combination of impairments that lasted, or is expected to last, for a continuous period of at least 12 months. 20 C.F.R. §§ 404.923, 404.1509, 404.1520(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(1)(5)(c). Basic work activities include the "abilities and aptitudes necessary to do most jobs," including walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple instructions, using judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1522(b). An impairment or combination of impairments is "not severe" when the "medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85–28; *Yuckert v. Bowen,* 841 F.2d 303, 306 (9th Cir. 1988) (recognizing and applying SSR 85–28).

The claimant bears the burden at step two, *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005), and must establish the existence of a severe impairment by objective medical evidence from an acceptable medical source. 20 C.F.R. § 416.921. In reviewing an ALJ's findings at step two, the court "must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant] did not have a medically severe impairment or combination of impairments." *Webb*, 433 F.3d at 687. The ALJ's failure to address an impairment at step two is harmless if the ALJ considered the impairment when formulating the claimant's RFC. *Lewis*, 498 F.3d at 911.

**B.     Analysis**

Here, the ALJ specifically addressed plaintiff's DVT and blood clots, citing to plaintiff's medical records, which showed that, after her July 2017 microdiscectomy and fusion, she "was identified with acute occlusive thrombus that involved both right posterior tibial vein branches from the distal calf, extending into the medial fool as well as acute occlusive deep vein thrombosis involving one left posterior tibial vein within the inframalleolar region." Tr. 23; *see* Tr. 1684 (indicating blood clots were found in both of plaintiff's ankles after surgery). The ALJ noted that plaintiff was first prescribed Coumadin and then "switched to Eliquis." Tr. 23; *see* Tr. 1716 (indicating plaintiff was prescribed Coumadin before she was discharged from the hospital, and she was considered low risk for DVT and never had DVT before); *id.* (noting plaintiff's medication was changed to Eliquis in August 2017). The ALJ also observed plaintiff stopped taking Eliquis but resumed after "recurrent DVT in the right posterior tibial vein had been noted in November 2017." Tr. 23. Indeed, in October 2017, an additional hyercoagulable work up was performed, which showed normal results, and the Eliquis was discontinued. Tr. 1716. However, in November 2017, plaintiff presented with recurrent right leg pain and a venous

duplex ultrasound identified recurrent DVT in the right posterior tibial vein; CT imaging did not identify an etiology to explain her recurrent DVT. *Id.* Plaintiff thereafter began taking Eliquis again. *Id.*

The ALJ noted that in June 2018, plaintiff reported she had right midfoot pain, which plaintiff suspected was related to DVT; however, as the ALJ correctly observed, "this was not confirmed." Tr. 23 (citing Ex. 13F, 46 (plaintiff reported that nurse in oncologist's office had "said that perhaps the swelling and pain may be due to an incompetent valve related to her DVT or being on warfarin"), 46, 49 (plaintiff was "reassured this lateral foot pain is not related to blood clot"). In a chart note, plaintiff's treating physician, Dr. Deborah Murphy, wrote: "I suspect this is a ganglion cyst or other swelling over the tendons of the midfoot," i.e., that it was not related to DVT. Tr. 1642.

Records from November 2018 show plaintiff had stopped taking Eliquis on her own and spoke with Dr. Murphy about this, upon her oncologist's suggestion. Tr. 1644. Dr. Murphy told plaintiff, "I agree that you can stop the Eliquis." Tr. 1646.

In February 2020, plaintiff complained of continued discomfort from her left leg varicose veins. Tr. 1716. While plaintiff had tolerated Eliquis well, she asked to discontinue the medication, and her oncologist approved that request. *Id.* The doctor noted that plaintiff's risk of recurrent DVT "at this point is very small," and that plaintiff "leads a very active lifestyle and is a non-smoker without prior history of blood clots before the 2017 diagnosis." *Id.* To minimize the risk of blood clots from her varicose veins, it was recommended that she wear compression stockings for long plane trips and car rides. *Id.*

On July 14, 2020, Dr. Murphy completed a Physical Residual Functional Capacity Assessment. Tr. 1707. While Dr. Murphy indicated that plaintiff suffered from deep vein

thrombosis, her primary diagnosis was lumbar back pain, and that diagnosis was the focus of Dr. Murphy's recommendations. For instance, Dr. Murphy explained that plaintiff was unable to lift more than ten pounds due to lower back pain, any torque in her back could trigger pain and require her to remain supine for 30 minutes, any movements that require engagement of her core muscles to stabilize her low back could worsen her pain, and she had to change positions to improve her constant pain to a tolerable level. Dr. Murphy's assessment did not address DVT in particular or explain how DVT prevented plaintiff from performing basic work activities.

On this record, the ALJ concluded the "evidence does not suggest that [plaintiff] is unable to ambulate effectively because of her . . . blood clot issues." Tr. 19. The ALJ observed that while plaintiff continued to take Eliquis for DVT, "her intact physical functioning . . . does not suggest the presence of significant ongoing limitations from this condition." Tr. 23. The ALJ specifically noted that plaintiff did not use a walking assistive device and "has been chronicled throughout the record with generally intact physical functioning, including full strength, sensation, reflexes, and gait." *Id.* (citing Ex. 12F, 53 (heal-shin and heal-toe gait were intact); Ex. 18F, 3 (normal muscle strength and gait); Ex. 19F, 11 (normal reflexes and gait). Indeed, the record is noticeably silent as to how DVT affected plaintiff's ability to work, other than that she required medication, which curbed her symptoms, until she ultimately stopped taking it with her doctors' approval. In sum, plaintiff failed to meet her burden at step two that her DVT and blood clots were "severe" impairments that significantly limited her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(1)(5)(c). When reviewing an ALJ's findings at step two, the court "must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant] did not have a medically

severe impairment or combination of impairments." *Webb*, 433 F.3d at 687. That standard has been met here.

## II. Medical Opinion Testimony

Plaintiff claims the ALJ erred in failing to properly evaluate Dr. Murphy's medical opinion.

### A. Relevant Law

Plaintiff filed for benefits on February 20, 2019. For claims filed on or after March 27, 2017, Federal Regulation 20 C.F.R. § 404.1520c governs how an ALJ must evaluate medical opinion evidence under Title II and 20 C.F.R. § 416.920c governs under Title XVI. *Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 82 Fed. Reg. 5844, *available at* 2017 WL 168819 (Jan. 18, 2017). Under these new regulations, ALJs no longer "weigh" medical opinions but rather determine which are most "persuasive." 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(c). To that end, controlling weight is no longer given to any medical opinion. *Revisions to Rules*, 82 Fed. Reg. 5844, at 5867-68; *see also* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner evaluates the persuasiveness of all medical opinions based on (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(a), (c)(1)-(5); 20 C.F.R. § 416.920c(a), (c)(1)-(5).

The factors of "supportability" and "consistency" are considered to be "the most important factors" in the evaluation process. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "[S]upportability" means "[t]he more relevant the objective medical evidence and supporting

8 – OPINION AND ORDER

explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(1). "[C]onsistency" means "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2).

The new regulations require the ALJ to articulate how persuasive the ALJ finds the medical opinions and to explain how the ALJ considered the supportability and consistency factors. 20 C.F.R. § 404.1520c(a), (b); 20 C.F.R § 416.920c(a),(b); *see Tyrone W. v. Saul*, No. 3:19-CV-01719-IM, 2020 WL 6363839, at *7 (D. Or. Oct. 28, 2020). "The ALJ may but is not required to explain how other factors were considered, as appropriate, including relationship with the claimant (length, purpose, and extent of treatment relationship; frequency of examination); whether there is an examining relationship; specialization; and other factors, such as familiarity with other evidence in the claim file or understanding of the Social Security disability program's policies and evidentiary requirements." *Linda F. v. Comm'r Soc. Sec. Admin.*, No. C20-5076-MAT, 2020 WL 6544628, at *2 (W.D. Wash. Nov. 6, 2020). However, ALJs are required to explain "how they considered other secondary medical factors [if] they find that two or more medical opinions about the same issue are equally supported and consistent with the record but not identical." *Tyrone*, 2020 WL 6363839, at *6 (citing 20 C.F.R. §§ 404.1520c(b)(2) and 404.1520c(b)(3)).

9 – OPINION AND ORDER

The court must continue to consider whether the ALJ's decision is supported by substantial evidence. *See Revisions to Rules*, 82 Fed. Reg. at 5852 ("Courts reviewing claims under our current rules have focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision."); *see also* 42 U.S.C. § 405(g).

### B.     Whether the "Specific and Legitimate" Standard Still Applies

Under existing Ninth Circuit law, an ALJ must provide "clear and convincing" reasons to reject an uncontradicted opinion from a treating or examining doctor and "specific and legitimate" reasons to reject a contradicted opinion from such doctor. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). The regulations pertaining to applications filed before March 27, 2017, set out a hierarchy for treatment of opinion evidence that, consistent with Ninth Circuit case law, gives treating sources more weight than non-treating sources, and examining sources more weight than non-examining sources. *See Standards for Consultative Examinations and Existing Medical Evidence*, 56 Fed. Reg. 36,932, *available at* 1991 WL 142361 (Aug. 1, 1991); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (adopting the "clear and convincing" and "specific and legitimate" standards for rejecting treating and examining source medical opinions); *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983) (holding that "[i]f the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record).

The Ninth Circuit has not yet considered whether the revision of the 2017 regulations requires re-evaluation of the "specific and legitimate" standard for review of medical opinions. *See Robert S. v. Saul*, No. 3:19-CV-01773-SB, 2021 WL 1214518, at *4 (D. Or. Mar. 3, 2021),

*report and recommendation adopted*, 2021 WL 1206576 (D. Or. Mar. 29, 2021) (collecting cases). Nevertheless, "[e]ven under the Commissioner's new regulations, the ALJ must articulate why he has rejected the opinion" and "the Ninth Circuit's 'specific and legitimate standard' is merely a benchmark against which the Court evaluates that reasoning." *Scott D. v. Comm'r Soc. Sec.*, No. C20-5354 RAJ, 2021 WL 71679, at *4 (W.D. Wash. Jan. 8, 2021); *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

**C.      Analysis**

Dr. Murphy treated plaintiff since March 2018. Tr. 1715. Again, in her July 14, 2020 Physical Residual Functional Capacity Assessment, Dr. Murphy opined that plaintiff could occasionally and frequently lift less than 10 pounds, and stand and/or walk for less than two hours, but had to periodically alternate sitting and standing to relieve pain and discomfort. Tr. 1708. Dr. Murphy also opined that plaintiff could never climb, balance, stoop, kneel, crouch, or crawl. Tr. 1709. Additionally, Dr. Murphy explained that plaintiff's use of her upper and lower extremities was limited because "[a]ny torque on the back can trigger pain" could require plaintiff to remain supine for 30 minutes or more. Tr. 1708. Dr. Murphy clarified that "reaching without engaging core torso muscles is okay." Tr. 1710.

The ALJ rejected Dr. Murphy's opinion because it was "grossly inconsistent with the record as a whole."[2] Tr. 24. More specifically, the ALJ observed that plaintiff "has been chronicled throughout the record with generally intact physical functioning, despite her pain, including full strength, sensation, reflexes, and gait." Tr. 24 (citing Ex. 12F, 53, 18F, 3, 19F,

---

[2] Plaintiff argues that the ALJ did not consider Dr. Murphy's Physical Residual Functional Capacity Assessment because the ALJ did not specifically cite to the exhibit. Pl. Br. 16. This argument is not well-taken; the ALJ indicated that Dr. Murphy "submitted several opinions" and the ALJ's synopsis of those opinions is consistent with what Dr. Murphy wrote in her assessment.

11 – OPINION AND ORDER

11).  The ALJ also observed that plaintiff "has further been described as active, doing a significant amount of house work, exercise, and taking airplane trips."  Tr. 24 (citing Ex. 12F, 52, 16F, 5).

In support of his decision, the ALJ cited to the record extensively.  The ALJ first noted that, before plaintiff had surgery, she experienced some symptom improvement through injections and physical therapy.  Tr. 20-21.  Indeed, as the ALJ observed, chart notes from May 2015 indicate that plaintiff "just started physical therapy and is now reconsidering getting back surgery.  She states that she went last weekend without taking any narcotics and states that her back pain is tolerable.  She is scheduled for surgery in June but would like to hold off for now."  Tr. 438.  The ALJ also noted that in August 2016, plaintiff reported she was going to the gym and working in her garden.  Tr. 21 (citing Tr. 419).  Chart notes in fact indicate that plaintiff "[s]uspects she flared the pain by gardening more often this summer."  Tr. 419.  The same chart notes state that plaintiff "stopped going to the gym and has been walking 2 miles per day instead," and "rarely uses medication for pain."  Tr. 419.

Moreover, as the ALJ noted, chart notes from September and October 2016 and April 2017 describe plaintiff "as ambulating freely around the room" and "able to transfer to and from the table without difficulty," and that she "had normal coordination and gait, demonstrated no evidence of instability or laxity," and had "intact reflexes, intact sensation, and negative straight leg raise test."  Tr. 21 (citing Ex. 2F, 28-29 ("ambulates freely around the room, transfers to and from the table without difficulties," "straight leg raise is negative," normal coordination, "no evidence of instability or laxity," 5/5 strength in both lower extremities); 47-48 (same); 11-12 (same, except straight leg raise is painful on the right).  And, as the ALJ observed, records from shortly before plaintiff's surgery show that plaintiff was exercising "three to five times a week,

12 – OPINION AND ORDER

including using a treadmill/elliptical, and weight lifting." Tr. 21 (citing Ex. 2F, 7); *see* Tr. 367 ("She exercises 3 to 5 times each week. Her exercise regiment [sic] consists of using a treadmill/elliptical weight lifting.").

The ALJ also cited to chart notes following plaintiff's surgery in July 2017 that showed she "had recovered well" and reported improvement in her back pain. Tr. 21 (citing Ex. 4F, 8 ("Since surgery pt reports she is doing well." "Her back pain is improving.")). As the ALJ observed, records indicate plaintiff was "negative for arthralgias, back pain, joint swelling and myalgias." Tr. 21 (citing Ex. 4F, 4).

The ALJ's decision goes on to describe plaintiff's medical history following the surgery, including that plaintiff took only Tylenol; had intact strength, sensation, and reflexes; had normal range of motion, normal reflexes, and normal sensation; was walking two to three miles per day; and flew to Indiana and San Diego in August 2019, "suggesting that she was able to sit for more than half an hour at a time." Tr. 21 (citing Ex. 6F, 11, 12F, 52). These observations are supported by the record. *See* Tr. 1844 (November 2017: describing how plaintiff "has been doing exercises daily, walked on the treadmill the past 2 days; walking x 20 minutes"); Tr. 528, 1859 (November 2017: describing plaintiff was taking only Tylenol, and no longer taking oxycodone, and "has been walking on treadmill 3.5 x 30 minutes—with holding on"); Tr. 525 (May 2018: "She continues to have chronic back pain, which she is managing with Tylenol."); Tr. 519 (November 2018: "Melissa exercises regularly by running on the elliptical, working out on the stair-master, and lifting weights."); Tr. 1650 (August 2019: normal gait, including normal heel-shin and heel-toe, intact strength and sensation, and intact patella and brachial reflexes); Tr. 1718 (February 2020: describing normal muscle strength, normal gait, and no focal motor deficit).

13 – OPINION AND ORDER

Finally, the ALJ observed that plaintiff's records "noted that [she] was having difficulty accepting changes from her conditions, 'leading to continued persisten[t] behaviors that exacerbate pain condition.'" Tr. 22 (citing Ex. 15F, 61).  Indeed, a psychologist made these observations in June 2019.  Tr. 1658.  The psychologist recommended that plaintiff "[w]ould benefit from acceptance oriented treatment" and wrote, "You are absolutely someone who pushes yourself hard."  *Id*.; *see also* Tr. 1807 (noting plaintiff was "[v]ery frustrated" by continuing pain," but was "having trouble accepting limitations, pushes self and crashes").  The psychologist further noted, "I agree that looking for work is a good idea.  Having a sense of mastery, purpose, contribution, etc are all so important for mood and honestly for the experience of pain."  Tr. 1658.

Thus, in rejecting Dr. Murphy's opinion, the ALJ considered whether it was supported by and consistent with the objective medical evidence.  Plaintiff argues for a different interpretation of the record, claiming that the ALJ may not "pick and choose among the evidence."  Pl. Br. 18.  However, the ALJ cited to a plethora of evidence in support of his decision that plaintiff is not disabled.  Because the ALJ's interpretation is reasonable and supported by substantial evidence, this court must uphold it.  *Tommasetti*, 533 F.3d at 1038.

## ORDER

The Commissioner's decision is AFFIRMED.

DATED  June 27, 2022.

                                                         /s/ Youlee Yim You
                                                         Youlee Yim You
                                                         United States Magistrate Judge